UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN

LBUBS 2007-02 TOWNE CENTER ROAD
LLC, et al.

      Plaintiff,

                             Case No.: 2:09-cv-13249-TLL-CEB
                             Hon. Thomas L. Ludington

SAGINAW SH-MG, et al.

      Defendants.

_____

## DEFENDANTS' MOTION TO SET ASIDE APPOINTMENT OF RECEIVER

Defendants SAGINAW HIX-MG, LLC; SAGINAW HIX-KG, LLC; SAGINAW HIX-AGA, LLC; SAGINAW HIX-JY, LLC; SAGINAW HIX-MK, LLC; SAGINAW HIX-BS, LLC; SAGINAW HIX-BB, LLC; SAGINAW HIX-FA, LLC; and SAGINAW HIX-MGR, LLC (hereinafter "Holiday Inn Defendants") and SAGINAW SH-MG, LLC; SAGINAW SH-KG, LLC; SAGINAW SH-AGA, LLC; SAGINAW SH-JY, LLC; SAGINAW SH-MK, LLC; SAGINAW SH-BS, LLC; SAGINAW SH-BB, LLC; SAGINAW SH-FA, LLC; and SAGINAW SH-MGR, LLC (hereinafter "Sheraton Defendants") (the Holiday Inn Defendants and Sheraton Defendants are collectively referred to as "Defendants") hereby move the Court for an Order Setting Aside the Appointment of a Receiver by the Circuit Court for the County of Saginaw (the "State Court Action") on August 7, 2009, on the following grounds:

(1) Plaintiffs improperly obtained the Ex Parte appointment of a Receiver in the State Court Action without fully informing the Court of the facts surrounding the two loans at issue in this litigation. In all likelihood, had the Court been aware of the full facts, the Court would not have granted Plaintiffs' ex parte request for a Receiver. There are many facts which Defendants must be afforded the opportunity to present to the Court, which demonstrate that Plaintiffs are in breach of their obligations under the Loan and have not acted in good faith throughout this dispute.

1

(2) Despite the express knowledge that Judge William Crane, the Judge assigned to the State Court Action, has a personal relationship with Plaintiffs' counsel, and regularly informs opposing parties of this fact when such parties are present, Plaintiffs nonetheless refused to seek the recusal of Judge Crane, and wrongfully obtained the appointment of the Receiver without providing notice and the opportunity to be heard to the Defendants.

(3) A legitimate accounting dispute exists between the parties as Plaintiffs must reimburse Defendants for funds used to renovate the Properties, to pay taxes and insurance. Defendants have completed their calculation of what is owed after applying the appropriate credits from Plaintiffs and stand ready to deposit the balance with the Court. (See, Exhibit 1, Declaration of Kevin Golshan ("Golshan Decl."), ¶ 15, 16, 17.)

(4) Since the commencement of the dispute, and indeed prior to the commencement of the State Court Action, the Defendants have been willing to bring the loans current after a reconciliation. Plaintiffs refuse to reconcile the Loans. In fact, even after commencing the litigation, Plaintiffs still refuse to simply tell Defendants what is owed. (Golshan Decl., ¶ 17, 19, 20, 22.)

(5) The parties have been in negotiations for months and Plaintiffs indicated that they would not pursue legal intervention while discussions continued. (Golshan Decl., ¶ 15, 16, 17, 19, 20, 22.)

(6) Pending a resolution of the accounting dispute, Defendants previously consented to the use of a "lock box", but Plaintiffs failed to follow through with this solution. A "lock box" is a much less intrusive means available to provide Plaintiffs with their requested relief. (Golshan Decl., ¶ 17.)

(7) Plaintiffs are affiliates of LNR, a national commercial real estate loan servicer and developer that is actively bolstering its own portfolio by aggressively foreclosing on its borrowers.[1]

In support of this Motion, Defendants rely upon the facts set forth herein, the supporting Memorandum of Points and Authorities, the pleadings and papers filed herein, and upon such further argument and authorities as the Court may request or permit to be presented on the matter.

/s/ Jennifer Hastings  P55657
Jennifer Hastings  P55657
DICKINSON WRIGHT PLLC
38525 Woodward Avenue, Suite 2000
Bloomfield Hills, MI  48304
248-433-7200

*Attorney for Defendants*

Dated:  August 27, 2009

---

[1] See, e.g., "*Foreclosure 'Blindsided' His Company, Says Corcoran*", Dorchester Reporter, August 6, 2009, attached as Exhibit F to Golshan Decl.

## MEMORANDUM OF POINTS AND AUTHORITIES

### I.    INTRODUCTION

The present litigation arises out of two loans made by Lehman Brothers and secured by two parcels of real property. Both loans funded on or about December 1, 2006. In the first loan, Lehman Brothers loaned the original principal amount of $6,770,000.00 (the "Holiday Inn Loan") to the Holiday Inn Defendants for the acquisition of the real property located at Holiday Inn Express, 2501 Tittibawasee Road, Saginaw Michigan (the "Holiday Inn Property"). In the Second loan, Lehman Brothers loaned the original principal amount of $5,430,000.00 (the "Sheraton Loan") for the acquisition of the real property located at Sheraton Four Points, 4960 Towne Center Road, Saginaw, Michigan (the "Sheraton Property"). (The Sheraton Property and Holiday Inn Property are collectively referred to as the "Properties" and the Sheraton Loan and the Holiday Inn Loan are collectively referred to as the "Loans"). Each Loan is evidenced by, among other documents, a Promissory Note (collectively referred to as the "Note") and Fee and Leasehold Mortgage (collectively referred to as the "Mortgage").

Pursuant to the terms of the Loans, Defendants were to make monthly payments of principal, interest and "Reserves". The Reserves were to be segregated by Plaintiffs in an Escrow Account and applied to the payment of taxes, insurance or to reimburse Defendants for amounts expended for improvements of the Property. (Golshan Decl., ¶ 11, 12.) Specifically, Section 3.4 of the Mortgage states, in relevant part:

> 3.4 RESERVES. (a) Borrower shall pay to Lender on each date that a regularly scheduled payment of principal or interest is due under the Note (a) one-twelfth of an amount which would be sufficient to pay the Taxes payable, or estimated by Lender to be payable, during the next ensuing twelve (12) months and (b) one-twelfth of an amount which would be sufficient to pay the Insurance Premiums due for the renewal of the coverage afforded by the Policies upon the expiration thereof (the amounts in (a) and (b) above shall be called the "Escrow Fund"). . . The Escrow Fund and the payments of interest or principal or both, payable pursuant to the Note shall be added together and shall be paid as an aggregate sum

by Borrower to Lender. Lender will apply the Escrow Fund to payments of Taxes and Insurance Premiums required to be made by Borrower pursuant to Sections 3.2 and 3.3 hereof. If the amount of the Escrow Fund shall exceed the amounts due for Taxes and Insurance Premiums pursuant to Sections 3.2 and 3.3 hereof, Lender shall, in its discretion, return any excess to Borrower or credit such excess against future payments to be made to the Escrow Fund.

In addition, Exhibit B to the Mortgage sets forth the procedures by which Plaintiffs are required to reimburse Defendants for amounts expended to improve the Properties. Exhibit B provides, in relevant part:

2. Reserve Deposits.

(a) Concurrently with the execution of this Security Instrument, Borrower shall deposit with Lender the Deferred Maintenance Deposit. The Deferred Maintenance Deposit shall be applied as provided in Section 4.1 of this Exhibit B.

(b) On each date that a regularly scheduled payment of principal or interest is due under the Note, Borrower shall be required to make a Monthly Deposit.

(c) Lender shall deposit each Monthly Deposit, as received, in an escrow account (the "Reserve"). Out of each Monthly Deposit, the Monthly Replacement Account Deposit shall be allocated to an account (the "Replacement Account') for the payment of Replacements and FFE Replacements, and the Monthly Leasing Account Deposit shall be allocated. to an account (the "Leasing Account,) for the payment of Tenant Improvements and Leasing Commissions (as defined below) in conjunction with Leases (as hereinafter defined).

* * *

3. Disbursements.

(a) Provided no Event of Default exists, Lender shall make disbursements of funds available in the Replacement Account to reimburse Borrower for Replacements.

* * *

(c) Lender shall, upon written request from Borrower and satisfaction of the requirements set forth in this Section 3. disburse to Borrower amounts from the Reserve necessary to reimburse Borrower for the actual costs of (i) any Leasing Commissions, (ll) any work relating to Replacements and FFE Replacements or Tenant Improvements (collectively, "Work"). and (iii) FFE Replacements.

* * *

4.1 Deferred Maintenance. Notwithstanding anything contained herein to the contrary, Borrower agrees to perform all of the Scheduled Repairs within sixty (60) days after the date hereof or such other period of time, if any, set forth in the

Reserve Letter. The Deferred Maintenance Deposit shall be used solely for the payment of the actual costs of the Scheduled Repairs. Upon completion of the Scheduled Repairs in accordance -with the requirements hereof; the portion of the Deferred Maintenance Deposit remaining undisbursed, if any, shall be disbursed to Borrower. All conditions, covenants and agreements set forth. herein with respect to a disbursement from the Replacement Account shall apply to the disbursements from the Deferred Maintenance Deposit.

Plaintiffs have failed to reimburse Defendants for costs associated with taxes, insurance and renovations under both Loans. With regard to the Holiday Inn Loan, Plaintiffs must reimburse Defendants a total $146,774.93. In connection with the Sheraton Loan, Plaintiffs must reimburse Defendants a total of $177,371.25. (Golshan Decl., ¶ 27, 28.)

After Lehman Brothers made the Loans, they were subsequently transferred to Wachovia Securities. Through at least April 2009, Wachovia continued to service the loans. However, commencing in April 2009, LNR Partners, Inc. ("LNR") began servicing the Loans.[2] (Golshan Decl., ¶ 13.) LNR is a real estate loan "servicer" and commercial property developer. Publicly available information, including articles published in real estate trade journals and nationally published periodicals, demonstrates that LNR is actively seeking to manufacture events of default on the part of borrowers in order to foreclose on commercial real estate to add to its own portfolio. Plaintiffs' conduct and course of dealing with regard to the instant litigation is consistent with LNR's modus operandi. (Golshan Decl., ¶ 14.)

Beginning in mid-2008, Defendants commenced extensive renovations of the Properties in order to "re-launch" the hotels in accordance with requirements from Holiday Inn and Sheraton, respectively. (Golshan Decl., ¶ 15.) With the consent of Wachovia, Defendants began purchasing new furniture, fixtures, signage and generally renovating the Properties. Pursuant to the Loans, Wachovia was to provide reimbursements to Defendants out of the funds in the escrow accounts. Defendants experienced significant delays in obtaining reimbursements and

---

[2] Defendants are presently unaware of who actually holds title to the Loans.

risked failing to timely complete the re-launch in accordance with the requirements of Holiday Inn and Sheraton. Additionally, because Defendants were drawing from the Escrow Account to pay for improvements at the Properties, rather than contributing to the Escrow Account, Defendants requested that Wachovia adjust the monthly payments. However, Wachovia failed to provide a substantive response to this request. As a result, Defendants used the operating income from the Properties to complete the improvements, pending a final reconciliation with Wachovia. (Golshan Decl., ¶ 16.) Presently, Plaintiffs must reimburse Defendants $124,202.48 for renovations to the Holiday Inn Property and $156,763.72 for renovations to the Sheraton Property.

Commencing in February 2009, Defendants contacted Wachovia to reconcile the Loans. Wachovia failed to provide a meaningful response, but did provide inaccurate statements for the Loans. Wachovia also contended that due to a lack of payment from Defendants, it would install a "lock box" at the Properties. In March 2009, Defendants consented to this arrangement, and again requested a reconciliation of the accounts. However, Wachovia failed to follow through with the "lock box" and ceased communicating with Defendants. (Golshan Decl., ¶ 17.)

Thereafter, Defendants received communications from LNR in April 2009. LNR once again contended that the loan was delinquent and demanded payment. (Golshan Decl., ¶ 18.) Defendants, as they have always been willing to do, offered to perform after a reconciliation of the Loans. Defendants engaged in several months of communications with LNR and even traveled from Los Angeles, California, to Miami, Florida, to have a comprehensive discussion. Yet again, even as Defendants sat in LNR's offices, LNR failed to provide a reconciliation of the Loans. (Golshan Decl., ¶ 19.)

In July 2009, Defendants and LNR continued to communicate regarding options for resolving their respective disputes under the Loans. Defendants advised LNR that they completed the renovations necessary for the "re-launch" of the Properties and again offered to tender all amounts owing, except for default interest and late charges, if LNR would simply provide an accurate accounting. LNR indicated that workout discussions were ongoing and that it would not seek judicial enforcement of the Loans. (Golshan Decl., ¶ 22.) Then, notwithstanding LNR's assurances, without any notice, and clearly in an attempt to hoodwink Defendants, Plaintiffs sought and obtained the appointment of a Receiver and a Temporary Restraining Order.

Plaintiffs commenced this suit in the Circuit Court for the County of Saginaw by filing two Complaints and two Ex Parte Applications for the Appointment of a Receiver. The two Complaints were consolidated by order of the Court. The Court granted Plaintiffs' Ex Parte Applications and issued an Order appointing the Receiver over Defendants' real and personal property. The Court also issued a Temporary Restraining Order and scheduled a hearing for the confirmation of the Receiver and a Preliminary Injunction to take place on August 19, 2009. Defendants filed an Opposition to the confirmation of the Receiver on August 14, 2009, and subsequently filed a Supplemental Opposition on August 17, 2009. Thereafter, on August 18, 2009, Defendants removed this action to the United States District Court for the Eastern District of Michigan upon learning that Plaintiffs' counsel failed to seek the recusal of Judge Crane, despite acknowledging the existence of a personal relationship with Plaintiffs' counsel.

In the Verified Complaint ("Complaint") for Appointment of Receiver and Money Damages, the Plaintiffs have sued for money damages on a debt. However, before obtaining any judgment, and while a substantial dispute exists as the veracity of Plaintiffs' allegations of default, Plaintiffs secretly filed an Ex Parte Motion asking the Court to appoint a receiver to

seize control of the Defendants' real property and personal property, which consists of two fully functional hotels. Before even providing Defendants with an opportunity to respond to the Plaintiffs' disputed allegations, Plaintiffs obtained the Receiver and a Temporary Restraining Order, effectively removing Defendants from possession of their property without notice and the opportunity to be heard. Even more concerning, Plaintiffs obtained the Receiver in the State Court Action despite the express knowledge that the judge assigned to the matter, Judge Crane, has a personal relationship with Plaintiffs' counsel and would ordinarily recuse himself from such matters.

Plaintiffs are not entitled to the appointment of a receiver, or any other prejudgment remedy, under the facts in the present case and Michigan law. Plaintiffs' conduct borders on outrageous. There has not been any adjudication of Plaintiffs' right to a judgment and Defendants contest the merits of Plaintiffs' allegations. Defendants must have the opportunity to present their defenses before there is any determination of Plaintiffs' right to seize Defendants' personal property.

As explained herein, Defendants dispute the amounts owing under the applicable loan documents. Further, it is Plaintiffs who are in breach of their obligations under the loans. Defendants stand ready, willing and able to deposit with the Court all funds which they believe are currently owed under the loan documents. Moreover, Plaintiffs have not acted in good faith in resolving the present accounting dispute. Therefore, Defendants respectfully request that this Court set aside the Receiver and Temporary Restraining Order issued in the State Court Action.

## II.    ARGUMENT

### a.  LNR Is Manufacturing Events of Default

Plaintiffs are affiliates of LNR, a real estate loan "servicer" and commercial property developer.   Publicly available information, including articles published in real estate trade journals and nationally published periodicals, demonstrates that LNR is actively seeking to manufacture events of default on the part of borrowers in order to foreclose on commercial real estate to add to its own portfolio.  (Golshan Decl., ¶ 14.)  Plaintiffs' conduct and course of dealing with regard to the instant litigation is consistent with LNR's modus operandi.

Since February 2009, Defendants demanded a reconciliation of the Loans in order to ascertain how much Plaintiffs were required to reimburse Defendants for taxes, insurance and renovations at the Properties.  At that time, Defendants contacted Wachovia, then the loan servicer, to engage in a conversation about the monthly payments due on the Loan.  In order to secure the monthly payments, Wachovia requested that a "lock box" be put in use at the Hotels. Under this scenario, Wachovia would monitor all amounts going into and out of the Properties. Defendants consented to this arrangement.  However, Wachovia failed to follow through and the lock box was never installed.  (Golshan Decl., ¶ 17.)

In April 2009, LNR took control of the Loans and systematically sought to prevent Defendants from bringing the Loans current.  In the interim, while a dispute existed as to how much Defendants were entitled to receive as reimbursements, Plaintiffs continued to charge Defendants default interest and late fees.  Defendants again participated in numerous telephone conferences and e-mail exchanges requesting reconciliation.   (Golshan Decl., ¶ 18, 19.) Plaintiffs refused to provide a comprehensive accounting, and demanded default interest and late fees.  In June 2009, Plaintiffs requested that Defendants travel to Miami, Florida to discuss

working out the Loan. At that meeting, Plaintiffs refused to provide an accounting or reimburse Defendants, and demanded that Defendants pay all outstanding balances, late fees and default interest, and further pay down principal in excess of the requirements in the Loan. (Golshan Decl., ¶ 19, 20.)

Thereafter, discussions continued between Plaintiffs and Defendants as to how to bring the Loans current. All the while, Plaintiffs assured Defendants that they would not proceed with litigation while negotiations were ongoing. (Golshan Decl., ¶ 22.) Nonetheless, despite Plaintiffs' own defaults, while there was no urgency and negotiations were ongoing, Plaintiffs brought an ex parte application seeking the appointment of a Receiver, without notice to Defendants. Furthermore, despite the knowledge that the assigned Judge would ordinarily advise opposing parties of his relationship with Plaintiffs' counsel, Plaintiffs still proceeded to obtain the Receiver without giving Defendants the opportunity to refute Plaintiffs' allegations. Clearly, Plaintiffs have no interest in actually reconciling the Loans. As a result, the Order appointing the Receiver must be set aside.

### b. Plaintiffs Material Breach of the Loans Excuses Defendants Future Performance.

Plaintiffs are in breach of their funding obligations under the Loans such that they cannot maintain an action against Defendants for any alleged subsequent breach. Specifically, pursuant to Section 3.4 and Exhibit B of the Mortgage, Defendants paid funds into an Escrow Account to be applied to taxes, insurance and renovations of the Properties. The Escrow Account proceeds were to be reimbursed to Defendants on request. Prior to February 2009, Plaintiffs were in default for failing to fully and accurately disburse proceeds to Defendants. As a result, Defendants demanded a reconciliation to determine the amounts owed by the respective parties

and to determine the amounts required to be paid into escrow going forward. To date, Plaintiffs refuse to comply with their own funding obligations.

It is well-settled in Michigan "that one who first breaches a contract cannot maintain an action against the other contracting party for his subsequent breach or failure to perform." *Flamm v Scherer*, 40 Mich App 1, 8-9 (1972); see also *Nat'l Teleinformation Network, Inc. v. Michigan Public Service Comm.*, 687 F Supp 330, 337 (WD Mich 1988); *Baith v Knapp-Stiles, Inc*, 380 Mich 119, 126 (1968), *citing Ehlinger v Bodi Lake Lumber Co*, 324 Mich 77 (1949) ("He who commits the first substantial breach of a contract cannot maintain an action against the other contracting party for failure to perform"); *see also* 5 Callaghan's Michigan Civil Jurisprudence, § 249, pp. 809-10.

Defendants' obligation to make monthly payments is excused in light of Plaintiffs' material breach of the Mortgage. Moreover, Plaintiffs ability to maintain an action for breach of the Loans is specifically precluded by their own breach of funding obligations. Worse, Plaintiffs failed to address their own breach of the Loans when they moved ex parte for the appointment of a Receiver, thereby failing to fully inform the Court of the present dispute.

Defendants have completed their own reconciliation of the Loans, as Plaintiffs refuse to do so. With regard to the Sheraton Loan, there is presently $263,976.95 available in the Escrow Account. Of this amount, Plaintiffs must reimburse Defendants $177,371.25 which includes $1,237.75 for taxes, $19,369.78 for insurance, and $156,763.72 for renovations. Thereafter, Defendants will tender $202,412.46, in addition to the $35,199.45 seized by the Receiver from Defendants' bank accounts and approximately $150,000.00 in net income received for the Sheraton Property since the Receiver took possession. (Golshan Decl., ¶ 27.)

With regard to the Holiday Inn Loan, there is presently $156,266.02 available in the Escrow Account. Of this amount, Plaintiffs must reimburse Defendants $146,774.93 which includes $14,287.24 for insurance, $124,202.48 for renovations, and $8,285.21 for taxes. Thereafter, Defendants will tender $74,227.18 in addition to the $162,806.05 seized by the Receiver from Defendants' bank accounts and approximately $120,000.00 in net income received for the Holiday Inn Property since the Receiver took possession. (Golshan Decl., ¶ 28.)

There is no dispute that Plaintiffs failed to comply with their responsibilities under the Loans. As a result, Defendants are excused from performance. Furthermore, Plaintiffs are precluded from seeking judicial relief while they are in breach of the Loans. Therefore, the appointment of the Receiver must be set aside.

### c. Defendants Should Have Been Permitted to Present a Defense to the Appointment of a Receiver And Issuance of a Preliminary Injunction At an Evidentiary Hearing

Despite Defendants' valid defenses, and Plaintiffs' own breaches of the Loans, the Receiver herein was appointed ex parte, without opportunity for hearing or objection by Defendant, and by a judge with a personal relationship with Plaintiffs' counsel. As a result, the Court must set aside the appointment of the Receiver.

Although the Court does have discretion to appoint a Receiver ex parte, this discretion should not be exercised unless less drastic means of protecting the interests of all parties are unavailable. *Petitpren v Taylor School District*, 104 Mich App 283, 295; 304 NW2d 553 (1981). Under the terms of the Mortgage, a less drastic means of protecting Plaintiffs' interests has already been established. Specifically, the Mortgage permits Plaintiffs to establish a "lock box" in order to monitor all funds related to the Properties. In fact, Defendants previously consented to this arrangement.

Due to the harsh nature of receivership, a court must proceed carefully before deciding that the circumstances warrant such remedy. Therefore, an evidentiary hearing may often be necessary before a court exercises its inherent equitable authority to appoint a receiver. *Petitpren, supra*, 104 Mich App at 297; 304 NW2d 553. Because a factual dispute exists herein, Defendants should have been afforded an evidentiary hearing before the Court appointed a receiver.

Similarly, an injunction of any sort is a drastic act of judicial power employed sparingly, and "only with full conviction of its urgent necessity." *Reed v Burton*, 344 Mich 126, 132; 73 NW2d 333 (1955). A receivership – here sought by a creditor to hasten collection on a debt by literally wrestling control of the management of two hotel properties from Defendants– "is an extraordinary remedy, to be resorted to only in cases of emergency." *White v Fulton*, 260 Mich 346, 347; 244 NW 494 (1932).

Plaintiffs secretly filed the Motions in bad faith and as a deliberate attempt to prevent Defendants from presenting competent evidence. Plaintiffs clearly applied this strategy because they are not entitled to the appointment of a receiver due to their own material breach of the Loans. Plaintiffs sought the appointment of the Receiver and a Temporary Restraining Order without notice or a bond. Yet, Plaintiffs wasted no time in seizing Defendants' assets, including bank accounts, a Holiday Inn and Sheraton, for their own use. The Court must set aside the appointment of the Receiver as Defendants should have been presented the opportunity to defend against Plaintiffs' allegations.

### d. Plaintiffs Are Estopped from Enforcing the Loans

Pursuant to the doctrine of Equitable Estoppel, Plaintiffs are precluded from enforcing the Loans at this time. As explained above, negotiations between Plaintiffs and Defendants have

14

taken place for months and Plaintiffs led Defendants to believe that no judicial enforcement of the Loans would take place until such negotiations terminated. Plaintiffs essentially lulled Defendants into a sense of false confidence, while Plaintiffs' own failure to reconcile the Loans is what triggered the underlying dispute. Plaintiffs created a "moving target" by tacking on unnecessary fees, expenses and default interest to the loan balance, despite their own failure to accurately account for the loans and their breaches of the explicit terms of the Loans.

On multiple occasions, Defendants have offered to provide payment of all outstanding amounts, after reconciling the amounts owed to Defendants as reimbursement from the Escrow Account. (Golshan Decl., ¶ 16, 17, 19, 22.) Plaintiffs simply refuse to do so. Unless an accounting is completed, it is impossible for Defendants to even know how much is outstanding. In fact, Defendants are willing to deposit the amounts they believe to be owing with the Court pending a resolution of this matter. (Golshan Decl., ¶ 27, 28)

Prior to commencing this litigation, Plaintiffs provided assurances to Defendants that workout discussions were ongoing and that they would not commence litigation. (Golshan Decl., ¶ 22.) Accordingly, Plaintiffs are estopped from now contending that the Loans are in default. Equitable estoppel arises "where a party, by representations, admissions or silence, intentionally or negligently induces another party to believe facts, and the other party justifiably relies and acts on this belief, and will be prejudiced if the first party is permitted to deny the existence of facts." See, *Casey v Auto Owners Ins Co*, 273 Mich App 388, 399 (2006), *citing Conel Dev, Inc v River Rouge Savings Bank*, 84 Mich App 415, 422-23 (1978).

The elements of equitable estoppel are: (1) a party induces another party to believe facts through representations, admissions, or silence intentionally or negligently; (2) the other party justifiably relies and operates on the belief; and (3) the other party is prejudiced if the first party

is permitted to deny the existence of the facts. *AFSCME Int'l Union v Bank One*, 267 Mich 281, 293 (2005).

Here, the representations of Plaintiffs induced Defendants to continue workout discussions and attempts to reconcile the amounts owed under the loans, rather than to attempt to escrow the amount Defendants believed to be owed. These representations were justifiably relied on by Defendants, and Plaintiffs should be estopped from now claiming breach of contract based on Defendants' reliance on Plaintiff's assurances. Further underscoring Defendants' equitable estoppel argument is the fact that, while Plaintiffs contend that the Loans have been in default since February, they waited over six months and until they received confirmation that Defendants had completed renovations before seeking the ex parte appointment of the Receiver. Therefore, the appointment of the Receiver must be set aside.

### III.    CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Receiver and Temporary Restraining Order be set aside.

Respectfully submitted

/s/ Jennifer Hastings  P55657
Jennifer Hastings  P55657
DICKINSON WRIGHT PLLC
38525 Woodward Avenue, Suite 2000
Bloomfield Hills, MI  48304
248-433-7200

*Attorney for Defendants*

Dated:  August 27, 2009

## CERTIFICATE OF SERVICE

I hereby certify that on August 27, 2009, I sent a copy of the foregoing Motion and Memorandum via electronic means to all counsel of record.

Respectfully submitted

/s/ Jennifer Hastings  P55657
Jennifer Hastings  P55657
DICKINSON WRIGHT PLLC
38525 Woodward Avenue, Suite 2000
Bloomfield Hills, MI  48304
248-433-7200

*Attorney for Defendants*

*BLOOMFIELD 37371-2 1009477*